FILED

DEC 10 2014

Clerk, U S District Court
District Of Montana
Billings

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 14-38-BLG-SPW |
| Plaintiff, | |
| vs. | OPINION and ORDER |
| JASON NEEL and MARIO ALBERT VILLEGAS, | |
| Defendants. | |

Defendant Jason Neel ("Neel") has filed a Motion to Suppress Title III Wiretap Evidence and for *Franks* Hearing (Doc. 244). In part of his motion, Neel seeks a *Franks* hearing to determine whether law enforcement intentionally or recklessly omitted evidence in their applications for wiretap warrants that could impeach the credibility of a Confidential Human Source ("CHS"). Co-defendant Mario Villegas ("Villegas") joins the motion (Doc. 249). The Court previously set a hearing to consider all of the arguments set forth by Neel and Villegas. (Doc. 254). The Court now finds that Neel and Villegas are not entitled to a *Franks* hearing and denies those portions of their motions.

1

# I. Background

## *A. The investigation*

This Court authorized three wiretaps in this case.[1] The Court signed the first authorization on January 23, 2014, which allowed law enforcement to intercept calls involving two of co-defendant Casey Fleming's ("Fleming") phones.[2] On February 3, 2014, this Court authorized a wiretap on Neel's phone. On February 15, this Court authorized a wiretap on co-defendant Desiree Jimenez's[3] phone. On February 21, 2014, this Court authorized a 30-day wiretap extension on one of Fleming's phones. Unless otherwise noted, the following information is taken from the wiretap applications. This recitation is not an exhaustive review of the alleged facts, but rather is intended to put the *Franks* arguments in context.

At the time of the investigation, Neel was incarcerated in a California prison on a murder conviction. Through contraband cell phones, Neel directed a drug trafficking organization. In late September 2013, Neel called a CHS and informed him that co-defendant Fleming was driving to Billings to distribute methamphetamine. The CHS contacted Fleming, and Fleming told the CHS that

---

[1] Neel and Villegas also challenge whether the wiretap applications complied with 18 U.S.C. § 2518. In this Order, the Court does not express an opinion on the merits of those arguments.
[2] Fleming pled guilty on October 2, 2014.
[3] Jimenez pled guilty on August 21, 2014.

2

he was going back to California but that he would soon return to Montana with more methamphetamine.

The CHS remained in contact with Neel and Fleming. Some of the CHS's calls with Neel and Fleming were consensually recorded. For example, in a recorded call, Fleming instructed the CHS to send him drug proceeds through Green Dot or MoneyGram. The investigating agents also consensually recorded calls where the CHS spoke with Neel and Fleming about shipping drugs through the mail.

In early November 2013, the CHS notified the agents that Fleming had returned to Billings. The CHS also relayed information that Fleming was dealing drugs out of a trailer. Law enforcement did a drive-by surveillance of the trailer and observed a car rented by Fleming parked outside.

Law enforcement asked the CHS to introduce Fleming to an undercover agent ("UCA"). On November 14, the CHS called Fleming and tried to set up a drug deal from Fleming to the UCA. Fleming said he was out of town, but he arranged for the CHS and the UCA to purchase methamphetamine from "Dave" in Roundup. "Dave" was later identified as co-defendant David Goffena ("Goffena"). The CHS and the UCA drove together to Roundup and purchased ½ ounce of methamphetamine from Goffena.

On November 15, the CHS tried to set up another sale of methamphetamine from Fleming to the UCA. Fleming agreed to sell the UCA ½ ounce. That day, the UCA met Fleming at a prearranged meeting place and purchased ½ ounce of methamphetamine. Fleming gave the UCA his phone number. Fleming also told the UCA that he purchased his drugs from a massive methamphetamine laboratory in southern California.

From that point, the wiretap applications scarcely mention the CHS. The UCA purchased methamphetamine from Fleming on several occasions. The UCA developed a good rapport with Fleming, and Fleming began giving the UCA 2 oz. of methamphetamine at a time for redistribution. Law enforcement obtained a search warrant for Fleming's text messages, which revealed discussions with Neel regarding drug distribution. Calls recorded pursuant to the wiretap orders produced incriminating evidence against Neel and Villegas.

### B. The CHS's credibility

In each of the wiretap applications, the agents discussed using the CHS. The agents provided the CHS with monetary compensation in addition to purchasing for him "a cell phone, phone cards, and two cheeseburgers." Law enforcement noted that the CHS had previous felony convictions for grand theft and possession of a controlled substance. Each application also stated the following:

> Also of importance, on December 26, 2013, the CHS voluntarily disclosed to Agents that he/she had a heroin addiction in the past but

4

had been clean for several years. On or about, December 20, 2013, the CHS succumbed to his/her addiction and used heroin for three days. The CHS does not believe he/she will succumb to the addiction again. However, if the CHS uses heroin again, Agents may not be able to use the CHS in the investigation. With the CHS's future in jeopardy, the development of another confidential source is important.

In the February 20 application for the wiretap extension for Fleming's phone the agents added the following information:

Additionally, Agents have intercepted calls on the Target Phone between FLEMING and BARNARD[4] that indicate the CHS may be involved in unauthorized methamphetamine distribution. Agents are attempting to gain additional evidence to determine if the CHS is in fact distributing methamphetamine for FLEMING.

The agents gained that information through an intercepted call from Fleming to Barnard made on February 5. In the call, Fleming told Barnard that "B" was going to receive one ounce of methamphetamine. The agents suspected that "B" referred to the CHS. The CHS never reported receiving the methamphetamine to the agents. From that information, the investigating agents suspected that the CHS was impermissibly dealing drugs for Fleming. The agents did not include the February 5 phone call in their wiretap application made on February 14.

After the last wiretap application, the agents confirmed that the CHS had continued distributing drugs without authorization. On March 27, agents arrested the CHS and interviewed him. The CHS apologized to the agents for the unauthorized drug dealing. The CHS told the agents that he had been using heroin

---

[4] This refers to co-defendant David Barnard.

5

continuously for the preceding several months. The CHS said that while he disclosed his initial relapse to the agents, he concealed his subsequent use. The CHS acknowledged that his behavior was wrong, but he did not inform the agents of his drug use because he knew they would be upset.

## II. Neel and Villegas have not made the requisite preliminary showing to earn a *Franks* hearing.

Neel and Villegas argue that a *Franks* hearing is appropriate to "flesh out" the CHS's unauthorized role in the organization. They contend that the February 5 call that incriminated the CHS was recklessly or intentionally omitted from the application made on February 14. Neel and Villegas further argue that the trained agents should have recognized signs of the CHS's drug use. They argue that the failure to recognize the CHS's months-long relapse was reckless and should have been included in all of the wiretap applications. Neel and Villegas claim that these credibility issues could have impacted this Court's finding of probable cause to authorize the wiretaps.

Defendants are entitled to a *Franks* hearing to challenge a wiretap application if they make substantiated "allegations of deliberate falsehood or of reckless disregard for the truth." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). To get a *Franks* hearing, a defendant must make a "substantial preliminary showing that (1) the affidavit contains intentionally or recklessly false statements or misleading omissions, and (2) the affidavit cannot support a finding of probable

6

cause without the allegedly false information." *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000).

Proof that law enforcement omitted information from an affidavit does not by itself invalidate a wiretap order. *United States v. Ippolito*, 774 F.2d 1482, 1485 (9th Cir. 1985). The omitted information must have been material. *Id.* Omitted impeachment information is material if the issuing court would not have found probable cause if it had been apprised of the missing information. *United States v. Meling*, 47 F.3d 1546, 1554 (9th Cir. 1995). If a wiretap application contains information supporting probable cause and necessity independent of information impeaching an informant's credibility, then a *Franks* hearing is not required. *United States v. Bennett*, 219 F.3d 1117, 1125 (9th Cir. 2000). "Where the wiretap application presents substantial evidence supporting a finding of probable cause independent of the information provided by an informant, that showing will compensate for an informant's low credibility." *Meling*, 47 F.3d at 1555.

Even assuming that law enforcement recklessly omitted the CHS's unauthorized drug dealing from the February 14 application, substantial evidence overwhelmingly supports a finding of probable cause. After the CHS arranged the meeting between Fleming and the UCA on November 15, the agents do not significantly rely upon information obtained by the CHS. Therefore, assuming that the CHS impermissibly dealt methamphetamine for Fleming for the duration of the

7

investigation, it does not matter that the CHS was scarcely credible after that date. The UCA purchased methamphetamine from Fleming and his associates on several occasions. The agents also obtained text messages from Fleming's phone that incriminated, among other people, Neel and Jimenez. Even if this Court purged all the information supplied by the CHS to the agents, probable cause still existed to believe that the interception of calls from Fleming, Neel, and Jimenez's phones would led to further evidence of their illegal drug trade.

Further, the Court would not necessarily purge all of the information provided by the CHS. The CHS consensually recorded several of his calls to Neel and Fleming. Assuming that this Court could not trust information relayed from the CHS to the agents, the CHS could not fabricate the content of those calls. They were recorded, and the agents could independently verify their contents.

Finally, this conclusion is bolstered by the fact that when this Court learned about the CHS's possible drug dealing in the extension application on February 20, this Court still found that the wiretap on Fleming's phone was appropriate. This Court knew about the CHS's possible nefarious dealings, and it granted the extension nonetheless.

For the same reason, knowledge of the CHS's months-long relapse would not have altered this Court's decision to grant the wiretap applications. The CHS relapsed around December 20, 2013. The CHS and the UCA met a month prior to

the relapse. As discussed above, the agents hardly mention information gathered from the CHS after the November 15 meeting between Fleming and the UCA. Also as detailed above, the agents relayed substantial evidence to support probable cause independent of the CHS's involvement.

## III. Conclusion

Neel and Frank do not make a substantial showing that any impeachment information for the CHS would have been material. Accordingly, IT IS HEREBY ORDERED:

1. Neel's Motion to Suppress and for *Franks* Hearing (Doc. 246) and Villegas' Motion to Suppress (Doc. 249) are DENIED IN PART insofar as they request a *Franks* hearing.

2. Counsel shall notify the Court by **2:00 p.m. tomorrow, December 11, 2014**, whether the remaining issues presented in the Motions to Suppress can be decided on the briefs or whether counsel believes a hearing is necessary to resolve factual disputes.

DATED this 10th day of December 2014.

SUSAN P. WATTERS
United States District Judge