IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

**FILED**

JAN 0 5 2014

Clerk, U.S. District Court
District Of Montana
Billings

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 14-38-BLG-SPW |
| Plaintiff, | |
| vs. | OPINION and ORDER |
| JASON NEEL and MARIO ALBERT VILLEGAS, | |
| Defendants. | |

Defendants Jason Neel ("Neel") and Mario Villegas ("Villegas") have moved to suppress evidence obtained through wiretaps. (Docs. 246 and 249). Neel and Villegas contend that the government did not make an adequate showing of necessity in its wiretap applications. Villegas also seeks to suppress information captured from his cell phone. (Doc. 250 at 13-15). The Court denied their request for a *Franks* hearing on December 10, 2014. (Doc. 294). The Court now considers their remaining arguments and denies the motions in their entirety.

## I. Factual and Procedural Background

Federal Bureau of Investigation ("FBI") agents sought three wiretaps while investigating a drug trafficking organization based in California. In January and February 2014, the FBI applied for wiretaps on two phones belonging to co-

defendant Casey Fleming ("Fleming") ("Fleming Application"),[1] Neel's phone ("Neel Application"), and co-defendant Desiree Jimenez's ("Jimenez") phone ("Jimenez Application").[2] The FBI later sought to extend the wiretap on one of Fleming's phones ("Fleming Extension"). The Court granted the applications. The Court took the following information from the four wiretap applications.

At the time of the investigation, Neel was incarcerated in a California state prison on a murder conviction. While incarcerated, Neel directed a drug trafficking organization through contraband cell phones. In late September 2013, a Confidential Human Source ("CHS") notified law enforcement that he received a call from Neel. Neel informed the CHS that Fleming was driving to Billings to sell methamphetamine. The next day through text messaging, Fleming told the CHS that he was staying at a hotel near downtown Billings. Fleming also informed the CHS that he was looking to sell nine ounces of methamphetamine. After several days, Fleming told the CHS that he was going back to California but that he would return to Montana with more methamphetamine. During Fleming's stay in Billings, the FBI discovered a car registered to Fleming in the hotel's parking lot. The car's registration revealed an address for Fleming in Taft, California.

The CHS remained in contact with Neel and Fleming and helped them traffic methamphetamine into Montana. The FBI consensually recorded calls

---

[1] Fleming pled guilty on October 2, 2014.
[2] Jimenez pled guilty on August 21, 2014.

between the CHS and Neel and Fleming. In one call, Fleming instructed the CHS to send him drug proceeds through Green Dot or MoneyGram. In other calls, the CHS spoke with Neel and Fleming about a package of methamphetamine that Fleming mailed to Montana.

In early November 2013, the CHS notified the FBI that Fleming had returned to Billings. The CHS told the FBI that Fleming was dealing drugs out of a trailer. The FBI's surveillance confirmed that a car rented by Fleming was parked outside the trailer.

The FBI asked the CHS to introduce Fleming to an undercover agent with the Montana Division of Criminal Investigation ("UCA"). On November 14, the CHS called Fleming and tried to set up a drug deal from Fleming to the UCA. Fleming said he was out of town, but he arranged for the CHS and the UCA to purchase methamphetamine from "Dave" in Roundup. "Dave" was later identified as co-defendant David Goffena ("Goffena").[3] The CHS and the UCA drove together to Roundup and purchased half an ounce of methamphetamine from Goffena.

The next day, the CHS tried to set up another sale of methamphetamine from Fleming to the UCA. That day, the UCA met Fleming at a prearranged meeting place and purchased half an ounce of methamphetamine. Fleming gave the UCA

---

[3] Goffena is scheduled to change his plea on January 8, 2015.

his phone number. Fleming also told the UCA that he purchased his drugs from a massive methamphetamine laboratory in southern California.

The UCA developed a good rapport with Fleming, and they remained in contact through the duration of the investigation. On December 12, the UCA purchased one ounce of methamphetamine from Fleming in a Billings parking lot. There, Fleming told the UCA that his drug trafficking ring was operated out of a California prison. Fleming told the UCA that he was looking for a distributor for eastern Montana and western North Dakota. He also said that he would sell methamphetamine to the UCA at a discount if he purchased it by the pound. Fleming told the UCA that the methamphetamine laboratory in southern California was run by the Mexican Mafia. He said that chemicals smuggled from Mexico into California were processed into methamphetamine at the southern California lab.

Fleming provided the UCA details about how he shipped methamphetamine from California to Montana. He said that people working for him would ship two packages: One contained the methamphetamine and the other contained a cell phone with GPS tracking capabilities. Fleming said he monitored their movements. He explained that if the packages were separated from each other, it could indicate that law enforcement may have intercepted the methamphetamine. If that happened, Fleming said he would know not to accept the package. He also

said he shipped the packages overnight express to make it harder for law enforcement to get a search warrant before the packages were delivered.

The FBI learned more about Fleming's operations through text messages obtained from Fleming's phone pursuant to a warrant. The texts revealed numerous messages between Neel and Fleming that discussed drug trafficking. In one conversation, Neel and Fleming talked about low quality methamphetamine that Fleming received from a supplier. On December 18, Neel texted Fleming that he arranged for Fleming to get his money back from "P." On December 21, Neel texted Fleming that "Pilot" needed "the stuff" before refunding Fleming. On the same day, Neel again mentioned "P." From those text messages, the agents believed that "P" or "Pilot" was a source of supply for Neel and Fleming. On December 24, Fleming received a series of text messages from an unidentified number that provided delivery tracking numbers, a Green Dot card number, and a money order number.

On December 26, the CHS reported to the FBI that Fleming had returned to California. On December 30, FBI surveillance observed Jimenez and co-conspirator David Hampton[4] ("Hampton") talking outside of Fleming's house in Taft, California. Soon after his return to California, Fleming initiated contact with

---

[4] The government charged Hampton in the Eastern District of California. On December 22, 2014, Hampton pled guilty to shipping methamphetamine to South Dakota. *See United States v. David Edward Hampton, Jr.*, 1:14-cr-58-LJO-SKO (E.D. Cal.) (Docs. 22, 23).

the UCA and asked if he was interested in purchasing methamphetamine. The UCA said yes. Fleming said that he would ship some methamphetamine to his associates in Roundup and would reserve two ounces of the methamphetamine for the UCA.

On January 6, 2014, Fleming called the UCA and told him that the methamphetamine was available in Roundup. The next day, the UCA went to Roundup and purchased two ounces of methamphetamine from Goffena. Per Fleming's instructions, the UCA did not pay Goffena. Instead, the UCA deposited $4,000 into Fleming's Wells Fargo bank account. The UCA called Fleming to confirm the transaction. Fleming told the UCA that Fleming had just received about five pounds of high quality of methamphetamine.

Two weeks later, the FBI obtained another search warrant for text messages from Fleming's phone. The text messages revealed more discussions between Fleming and Neel regarding drug trafficking and a source of supply. On January 13, Neel texted Fleming two phone numbers for "Pilot." On January 15, Neel texted Fleming that he was going to buy more drugs from "P."

On January 23, the FBI submitted the Fleming Application. The Fleming Application was accompanied by a 79-page supporting affidavit used to establish probable cause and the necessity to intercept calls from Fleming's phones. In a section entitled "Need for Intercept," the FBI stated that wiretapping Fleming's

phones was necessary to discover the full scope of the conspiracy. Specifically, the FBI wanted to know the sources of supply and distributors' identities. The FBI stated it was unsure if Fleming and Neel were involved in crimes apart from drug distribution. The FBI also stated that the wiretaps were needed to identify and locate stash houses in Montana and California. While the FBI knew of the stash house in Roundup, they suspected that Fleming and Neel used other stash houses to store and conceal drugs. Finally, the FBI stated that a wiretap was necessary to determine how the conspiracy laundered its money. All of these objectives were designed to take down the conspiracy as a whole.

The agents also listed alternative investigatory techniques that had been tried and failed, appeared unlikely to succeed if tried, or were too dangerous to employ. The techniques described by the agents were: (1) The use of confidential sources and informants; (2) Controlled drug purchases; (3) Pen registers, trap and trace devices, and toll analysis; (4) Surveillance; (5) Consensually-recorded conversations; (6) Search and arrest warrants; (7) Interviews, grand jury subpoenas, and immunity; (8) Trash searches; (9) Attempted use of other surveillance techniques; (10) Mail cover requests; (11) Vehicle and driver's license records; (11) Other wiretaps; and (12) Financial investigation. After describing each technique, the agents stated why they were insufficient to achieve the investigation's goals.

Specific to Neel and Villegas's arguments are mail cover requests and the financial investigation. The FBI did not employ mail covers. A mail cover is a service provided by the United States Postal Service where a list of all the sender and receiver names and addresses on each piece of mail received at a particular location can be obtained. The list is compiled by the mail carrier who would deliver the mail to the target address, and the list would ultimately be given to the FBI. The FBI stated that given the small population of Roundup, the mail carrier could not be trusted to not compromise the investigation, so the FBI did not use this technique.

The FBI also did not use grand jury subpoenas to get records from Wells Fargo or MoneyGram. The FBI stated an intention to issue a grand jury subpoena to Green Dot later in the month. The FBI searched the Financial Crimes Enforcement Network, which returned no results for Jimenez and Neel. The search returned five large cash deposits and withdrawals for Fleming, but the information was dated with the most recent transaction being a $20,000 withdrawal on May 31, 2012.

After the Court approved the Fleming Application, the FBI began intercepting calls from Fleming's phone. On the evening of January 23, the FBI listened as Fleming agreed to meet an unidentified male at a McDonald's. After waiting at the McDonald's for some time, Fleming called the unidentified male to

8

check his location. The male answered and excitedly told Fleming that his vehicle caught on fire on the freeway. The male told Fleming that his associate would deliver drugs to Fleming. After the call, Fleming texted Neel that "P's" car caught on fire. From that text, the agents believed that "Pilot" was the unidentified male who arranged to meet Fleming at the McDonald's. First responders to the car fire identified "Pilot" as Villegas.

Fleming purchased drugs from Villegas's associate. Neel and Fleming discussed the transaction through the early morning of January 24. Neel told Fleming that his mom was going test the drugs they shipped out of state. Fleming's mother is co-defendant Katherine Neel ("Katherine").[5]

Since October 24, 2013, the FBI had continually operated a pen register on Neel's phone. A pen register records the phone numbers dialed from the target phone. The FBI reviewed the pen register data from Neel's phone and discovered that Neel had been in contact with two individuals with connections to high level Mexican Mafia associates involved in methamphetamine distribution in southern California. The FBI also discovered that Neel communicated regularly with Villegas.

On February 3, based on the information obtained through their prior investigation and from information gleaned from Fleming's wiretap, the FBI made

---

[5] Katherine pled guilty on November 14, 2014.

the Neel Application. It was accompanied by a 90-page supporting affidavit. The sections describing the necessity for the wiretap and the alternative investigative techniques are largely the same as the Fleming Application. However, the FBI did make several additions. First, the FBI stated that it knew that Villegas was a first-level supplier for Fleming and Neel. The FBI explained that by intercepting calls from Neel's phone, it could likely gain insight into Villegas's operations. The FBI also stated the wiretap was necessary to locate the clandestine laboratory in southern California that Fleming described to the UCA. Finally, the FBI explained that it needed the wiretap to find out the contents of Neel's calls to individuals associated with the Mexican Mafia.

In the affidavit, the FBI discussed the same alternative investigative techniques mentioned in the Fleming Application. Due to the unique nature of investigating Neel, a prison inmate, the FBI concluded that most traditional investigative methods would be impossible to use. Coincidentally, Neel's phone broke around the same time. After his phone broke, Neel "rented" several other prison cell phones and the agents were unable to intercept Neel's calls. The wiretap on Neel's phone produced little to no information.

Due to Fleming's wiretap, the FBI knew that Fleming and Neel remained in constant contact. On January 25-26, Fleming spoke with Neel and Jimenez about smuggling drugs into prison for Neel. Jimenez and Fleming discussed transporting

drugs to a "mule," who would smuggle the contraband into Neel. At one point, Jimenez called Katherine about the plan. In another 78-minute call, Fleming and Neel discussed a range of topics, including Villegas and a different unknown source of supply identified by a nickname.

Fleming also spoke with Jimenez several times on the phone. In one instance, Jimenez called Fleming while shopping for a stainless steel thermos in which they would conceal methamphetamine for shipment. In another call, Jimenez and Fleming again described plans for smuggling drugs to Neel.

On February 14, the FBI submitted the Jimenez Application, which was accompanied by a 96-page supporting affidavit. The necessity and alternative techniques discussions largely repeated information contained in the Fleming and Neel Applications. The FBI stated that a wiretap on Jimenez's phone was necessary given that Neel's wiretap had been unproductive. The FBI explained that it knew that Neel "rented" various contraband cell phones and that he used those phones to frequently communicate with Jimenez. By tapping Jimenez's phone, the FBI could intercept calls from Neel. The FBI also explained that more conspirators could be identified because pen register data from Jimenez's phone revealed that she was in contact with other suspected co-conspirators, including Katherine and Hampton.

After the wiretaps were obtained, Fleming maintained phone contact with his distributors in Montana, including Goffena, the UCA, and co-defendants Kirsta Goffena ("Kirsta")[6] and David Barnard ("Barnard").[7] Fleming or somebody acting on his behalf continued to ship drugs to Montana. For example, on January 28, 2014, either Fleming or somebody acting on his behalf shipped a package of methamphetamine from Taft to Roundup. On the package, the sender was identified as "Traci," and the recipient was identified as "John Handen." The UCA continued to purchase methamphetamine shipped by Fleming. The UCA purchased methamphetamine from Goffena and Kirsta in Roundup. The UCA also purchased two ounces of methamphetamine in Billings from Barnard. Eventually, Fleming shipped four ounces of methamphetamine directly to the UCA. After each purchase, the UCA deposited money into Fleming's Wells Fargo bank account.

On February 20, the FBI submitted the Fleming Extension, which sought a 30-day extension of the wiretap on one of Fleming's phones. The FBI stated the information obtained up to that point from the wiretap on Fleming's phone. Again, the FBI largely repeated why it needed the wiretap and the discussion about alternative techniques. The FBI stated that while it identified Villegas as a front-line dealer, the continued interception from Fleming's phone was necessary to

---

[6] Kirsta is scheduled to change her plea on January 8, 2015.
[7] Barnard is scheduled to change his plea on January 7, 2015.

identify the other sources of supply. The FBI also explained that it still needed the wiretap to fully discover the scope of the conspiracy.

## II. Legal standard

The procedure for obtaining a wiretap is found in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, now codified at 18 U.S.C. §§ 2510-2520. *United States v. Giordano*, 416 U.S. 505, 507 (1974). The procedural steps provided in Title III "require strict adherence." *United States v. Kalustian*, 529 F.2d 585, 588 (9th Cir. 1975). In an application seeking judicial authorization for a wiretap, the government must include, among other requirements:

> [A] full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

18 U.S.C. § 2518(1)(c). Before authorizing a wiretap, the district court must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). "These two sections together make up the so-called necessity requirement for granting a wiretap order." *United States v. Ippolito*, 774 F.2d 1482, 1485 (9th Cir. 1985).

The purpose of the necessity requirement is to ensure that wiretapping is not used in situations where traditional law enforcement techniques would be

13

sufficient. *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001). To meet the necessity requirement, the government must show "that traditional investigative procedures (1) have been tried and failed; (2) reasonably appear unlikely to succeed if tried; or (3) are too dangerous to try." *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1112 (9th Cir. 2005). The government may not rely on general statements that are true in every investigation; rather, the "affidavit must show with specificity why in *this particular investigation* ordinary means of investigation will fail." *Ippolito*, 774 F.2d at 1486 (quoting *United States v. Robinson*, 698 F.2d 448, 453 (D.C.Cir. 1983)) (emphasis in original).

While a wiretap should not be the first step in an investigation, the government does not need to "exhaust every conceivable alternative before obtaining a wiretap." *United States v. Rivera*, 527 F.3d 891, 902 (9th Cir. 2008). The necessity requirement can be met if the affidavit indicates that further investigative procedures, if employed in good faith, would likely be ineffective. *United States v. Garcia-Villalba*, 585 F.3d 1223, 1228 (9th Cir. 2009). However, the government cannot "ignore avenues of investigation that appear both fruitful and cost-effective." *Ippolito*, 774 F.2d at 1486.

In investigating conspiracies, "the government is entitled to more leeway in its investigative methods." *United States v. McGuire*, 307 F.3d 1192, 1198 (9th Cir. 2002). "The necessity for the wiretap is evaluated in light of the government's

14

need not merely to collect some evidence, but to develop an effective case against those involved in the conspiracy." *United States v. Decoud*, 456 F.3d 996, 1007 (9th Cir. 2006). This includes not only the main conspirators, but also the satellite conspirators. *Rivera*, 527 F.3d at 902. The Ninth Circuit described the reasoning for the relaxed standard when investigating conspiracies:

> Conspiracies pose other special dangers. Unlike individual criminal action, which comes to an end upon the capture of the criminal, collective criminal action has a life of its own. Like the Hydra of Greek mythology, the conspiracy may survive the destruction of its parts unless the conspiracy is completely destroyed. For even if some or many conspirators are imprisoned, others may remain at large, free to recruit others eager to break the law and to pursue the conspiracy's illegal ends.

*McGuire*, 307 F.3d at 1197-98.

## III. Discussion

Neel and Villegas contend that the agents did not make a fully and complete statement regarding the necessity for a wiretap. Specifically, Neel and Villegas argue: (1) The wiretaps were not necessary to discover the location of stash houses, as the FBI knew about the Roundup stash house; (2) The UCA and the CHS were sufficient to obtain the desired information; (3) The FBI should have used a mail cover before making the applications; (4) The FBI should have conducted a more thorough financial investigation; (5) The Jimenez Application was unnecessary because the FBI had no information that intercepting calls from Jimenez's phone would further the investigation; and (6) The Fleming Extension did not meet the

statutory requirements for an extension application. The Court addresses these arguments in order.

### A. The FBI did not know the location of stash houses other than the one in Roundup.

Neel and Villegas argue that the FBI did not need the wiretap to identify stash houses. In support of his argument, Neel points out that the FBI confirmed the Roundup location where the Goffenas allegedly stored Fleming's methamphetamine. However, in the applications the FBI stated that it suspected that Fleming and Neel used other stash houses in Montana and California. Simply because the FBI identified a residence in Roundup as a stash house does not foreclose further investigation into where else drugs may have been stored. The Court rejects this argument.

### B. The sufficiency of the CHS and the UCA to identify the sources of supply.

Neel argues that the CHS and the UCA provided sufficient information because they were in contact with both Fleming and Neel. The government points out, however, that Fleming and Neel never provided details about their sources of supply to the CHS and the UCA. The government argues that the most information that Fleming provided to the UCA was that he obtained the methamphetamine from a super laboratory operated by the Mexican Mafia.

This Court finds the Ninth Circuit's decision in *Garcia-Villalba* instructive. In *Garcia-Villalba*, the DEA was investigating a sophisticated drug ring. 585 F.3d

16

at 1225. Using a confidential informant, an undercover agent was introduced to one of the organization's front-line dealers. *Id.* The UCA became a reliable customer and made a number of purchases over several months. *Id.* The government monitored the phone numbers dialed from the front-line dealer's phones. *Id.* at 1225-26. Through those devices, the government determined several of the dealer's associates' identities. *Id.* at 1226. However, the investigation stalled because the government could not get any more information. *Id.* After several more months, the government successfully applied for a wiretap on the dealer's phone. *Id.*

As the investigation unfolded, the DEA identified more members of the conspiracy. *Id.* Ultimately, the DEA obtained court authority to tap the phones of three other associates. *Id.* All four wiretaps produced incriminating information that led to the indictment of the conspiracy's members. *Id.* The district court denied a motion to suppress evidence obtained from the fourth wiretap. *Id.*

The Ninth Circuit affirmed. *Id.* at 1228. In response to an argument similar to the one made by Neel, the Ninth Circuit found that the UCA's mere continued connection with a front-line dealer did not negate the need for a wiretap. *Id.* at 1230. The Court noted that "[s]ophisticated drug conspiracies often rely on separation and limited contact between street level dealers and higher-ups,

meaning that traditional investigative techniques sometimes cannot end the threat that such organizations pose to public safety." *Id*.

Similar here, the UCA and the CHS could not determine the sources of supply for Fleming and Neel. While Fleming told the UCA generally about the clandestine laboratory in southern California operated by the Mexican Mafia, Fleming did not supply the exact location of the laboratory or the identities of the individuals supplying him with the methamphetamine. Over the entire course of the investigation, Fleming and Neel never divulged their sources of supply to the CHS and the UCA. The FBI was at a dead end with the use of the UCA and the CHS in regards to obtaining information about how the conspiracy obtained its methamphetamine. Further, continued use of the UCA jeopardized his safety. The Court agrees with the government that the use of wiretaps was necessary to identify Fleming and Neel's sources of supply.

*C. The FBI's decision to not use mail covers.*

Neel criticizes the agents for not using a mail cover on the shipped methamphetamine. Neel argues that the unspecified fear of a mail carrier exposing the investigation is insufficient to bypass the use of a mail cover. The government counters that a mail cover would not have identified Fleming and Neel's sources of supply. The Court agrees with the government

18

First, whoever shipped the packages used fictitious names. A mail cover would not have been effective in identifying co-conspirators. Second, the reality of a delivery person tipping off Fleming or his distributors was a legitimate concern for the FBI. The Court is persuaded by the government's argument that in a small town like Roundup word could spread that the postal service was monitoring mail delivered to the Roundup stash house. The chance of being exposed was heightened given Fleming's sophisticated shipping methods of monitoring two packages sent simultaneously.

Most importantly, using a mail cover would not have accomplished the investigation's objectives. While a mail cover may have corroborated shipments sent from California to Roundup, it would not have provided any information regarding Fleming and Neel's sources of supply. The Court agrees with the government that the use of a mail cover would not have revealed the full scope of the conspiracy.

*D. The FBI's financial investigation.*

Neel argues that the agents did not conduct a sufficient investigation into Fleming's finances. Neel contends that the agents should have used grand jury subpoenas to get records from Green Dot, Wells Fargo, and MoneyGram. The government argues that while Fleming's distributors sent him money via Green Dot and deposits into his Wells Fargo accounts, the records would not have

revealed the full scope of the conspiracy. The government also claims that given the small town location of Fleming's and Jimenez's banks, a grand jury subpoena might tip them off.

The Court is not persuaded by the government's argument that Fleming's bank would tip him off about a grand jury subpoena. While the Roundup and Taft branches were located in small towns, Wells Fargo is a large national bank. A Wells Fargo employee processing a grand jury subpoena for Fleming's bank accounts would likely be unable to locate Taft or Roundup on a map, much less know anybody involved in the conspiracy. However, the Court agrees with the government that the bank records would not have revealed the full scope of the conspiracy. The failure to obtain all possible information is not fatal to the applications.

The Ninth Circuit addressed a similar situation in *Rivera*. In *Rivera*, the DEA obtained three wiretaps during an investigation into a drug conspiracy. 527 F.3d at 896. The affidavits stated that a CHS regularly obtained methamphetamine from a front-line dealer. *Id.* After drugs purchases, the dealer would call another member of the conspiracy. *Id.* Those conspirators were in frequent contact with the organization's suspected money launderer. *Id.* The affidavits stated the purposes of the wiretaps were to verify the identities of the conspiracy's members

and to understand the conspiracy's methods of money laundering. *Id.* at 898. The district court granted the wiretaps and later denied a motion to suppress. *Id.* at 897.

The Ninth Circuit affirmed. Like here, the *Rivera* defendants attacked the government's failure to subpoena financial records to get a better understanding of the conspiracy's money laundering operations. *Id.* at 901. The Ninth Circuit agreed that the government failed to adequately explain why it did not subpoena those records. *Id.* However, the Court held that "considering the affidavit's detailed discussion of most of the other investigative techniques that the DEA used or considered using, we find these failures not to be fatal to the affidavit as a whole." *Id.*

Similar to *Rivera*, the FBI's detailed 16-page discussion about alternative investigative techniques do not render the failure to subpoena financial records fatal to the applications. Subpoenaing the financial records would likely not have revealed any information regarding the conspiracy's sources of supply. While the subpoenas could have revealed incriminating information, it would have likely been related to Fleming's Montana operations. The government had already built an effective case against the Montana distributors; it sought information regarding Fleming's sources of supply and other major distributors for Fleming. Bank records would likely not have revealed who Fleming paid for his drugs. Fleming's distributors deposited their proceeds into his bank accounts. The FBI had no

reason to believe that Fleming drafted checks made out to his sources of supply. Similarly, the Green Dot cards were used by front-line dealers to launder money to Fleming. None of these transactions pointed to or revealed identities of sources.

*E. The Jimenez Application.*

Neel argues that the Jimenez Application was unnecessary because the FBI already tapped Fleming's and Neel's phones. As discussed above, however, Neel's phone broke immediately after the Court approved the Neel Application. Since the agents could not tap phones used by Neel, the agents were unable to intercept calls initiated by Neel. The government argues that tapping Jimenez's phone was necessary to intercept more calls initiated by Neel. Also, a review of phone numbers dialed from Jimenez's phone revealed that she was in contact with other suspected co-conspirators such as Katherine and Hampton. Jimenez also had contact with the "mule" smuggling contraband into Neel.

The Court agrees with the government. In the Neel Application, the FBI detailed why interception of calls from Neel's was necessary. After Neel's phone broke, a wiretap of Jimenez's phone was necessary to gain a more complete understanding of the conspiracy. The Jimenez Application was not unnecessary.

*F. The Fleming Extension.*

Finally, Neel and Villegas argue that the Fleming Extension did not meet the statutory requirements for an extension application. The government argues that

22

the FBI met the additional burden by providing a full and complete statement of evidence obtained from the original interception and why continued interception of Fleming's phone was necessary. The Court is persuaded by the government's argument.

When the government seeks an extension of a wiretap order, the application must include "a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results." 18 U.S.C. § 2518(f). In addition, a court "is required to make the same findings for an extension order as it is for an original order." *United States v. Brone*, 792 F.2d 1504, 1506 (9th Cir. 1986). The government cannot simply transfer a showing of necessity from one application to another; it must independently meet the necessity requirement on each application. *Gonzalez, Inc.*, 412 F.3d at 1115. However, a district court is not required to "view a wiretap application in a vacuum." *Garcia-Villalba*, 585 F.3d at 1232. Rather, the court can consider facts and investigative techniques described in previous applications, as long as they apply to the government's showing of necessity on the current application. *Id.*

Neel and Villegas contend that the agents failed to meet the burden for an extension application by merely repeating the necessity section made in the previous applications. Neel contends that the extension "fails in the same respect as the first three affidavits." (Doc. 246 at 23-24). As described above, the first

three applications do not fail. Although the agents repeated much of the same information, the Fleming Extension still independently demonstrated a necessity to intercept calls from Fleming's phone.

In addition, the Fleming Extension complied with § 2518(f) by providing a statement that set forth the results of the Fleming Application. The Fleming Extension met all the requirements; it independently demonstrated necessity and it provided the statement mandated by § 2518(f). Therefore, the Fleming Extension was proper.

G. *Conclusion.*

Prior to submitting the applications, the agents thoroughly investigated the conspiracy. The agents used a CHS and a UCA to make controlled purchases of methamphetamine. The CHS and the UCA also consensually recorded phone calls with Neel and Fleming, and they gained knowledge about the conspiracy's general structure. The agents employed pen registers and trap and trace devices on not just phones operated by Fleming, Neel, and Jimenez, but also conducted a toll analysis on other suspected co-conspirators. The agents conducted surveillance when they reasonably could avoid being detected. The agents also used search warrants to view text messages from Fleming's phone. If the agents did not use an investigative technique, they adequately described why the technique would either be ineffective or too dangerous to try.

24

The agents made a full and complete statement of prior investigative procedures. But the traditional techniques would only lead "to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of ... other satellite conspirators." *United States v. Reed*, 575 F.3d 900, 909-10 (9th Cir. 2009). The agents demonstrated the necessity of the wiretaps to not only develop an effective case against Fleming, Neel, and the Montana distributors, but also against satellite conspirators in California and their sources of supply.

## IV. Villegas's additional arguments

Villegas makes several arguments in addition to the ones presented by Neel. The Court will consider each individually.

### A. Probable cause as to Villegas.

Villegas argues that evidence obtained from the wiretaps related to him must be suppressed, as the FBI did not demonstrate probable cause that he was involved in the conspiracy. The Court rejects this argument.

To get a wiretap, the government must demonstrate probable cause as to the person who is using the target phone. 18 U.S.C. § 2518(3). The government has no duty to establish probable cause and necessity as to every possible interceptee. *Reed*, 575 F.3d at 911; see also *United States v. Martin*, 599 F.2d 880, 884 (9th Cir. 1979) *overruled on other grounds by United States v. De Bright*, 730 F.2d 1255 (9th Cir. 1984) ("There is no constitutional requirement that the persons

25

whose conversations may be intercepted be named in the application."). Indeed, one of a wiretap's objectives is to discover unidentified co-conspirators. *United States v. Hyde*, 574 F.2d 856, 862 (5th Cir. 1978).

The FBI did not seek a wiretap of Villegas's phone. Rather, the FBI tapped Fleming's phone before he contacted Villegas. Therefore, the agents were not required to establish probable cause or necessity as to Villegas.

*B. Villegas's cell phone data.*

On March 11, 2014, the FBI obtained a warrant from the Central District of California to monitor cell site data and GPS information from Villegas's phone. The agents got that warrant using information obtained from Fleming's intercepted calls. *See* Doc. 260-4. Despite acknowledging the warrant early in his brief (*see* Doc. 250 at 4), Villegas argues that the government should not have obtained his cell phone's data without first getting a warrant. The government counters that it did get a warrant. The government is correct; the Central District of California issued the warrant on March 11, 2014. To the extent that Villegas argues that the warrant was the fruit of illegal wiretap applications, that argument is similarly rejected. As detailed above, the wiretap applications were properly made.

## V. Conclusion

For the reasons stated above, IT IS HEREBY ORDERED that Neel's

Motion to Suppress Title III Wiretap Evidence (Doc. 246) and Villegas's Motion

to Suppress (Doc. 249) are DENIED.

DATED this 5th day of January 2015.

*Susan P. Watters*

SUSAN P. WATTERS
United States District Judge